IN THE MATTER OF THE APPLICATION OF REGINALD BRANCH, GEORGE A. ENRIGHT AND JOHN A. HART-PENCE FOR RECOMMENDATION TO THE GOVERNOR FOR LICENSES TO PRACTICE AS ATTORNEYS-AT-LAW AND SOLICITORS IN CHANCERY IN THE STATE OF NEW JERSEY.

Argued January 11, 1904—Decided February 23, 1904.

1. The Supreme Court of New Jersey neither licenses attorneys-at-law nor admits them to practice.  They are invested with that privilege by letters-patent, issued by the governor of the state when he is assured that such licensees are possessed of the proper qualifications by a recommendation to that effect from the Supreme Court, based upon an examination made by it or under its supervision, which examination so made or supervised has, from the earliest periods, been a distinctive attribute of the Supreme Court, and as such existed in unqualified form at the time the constitution of 1844 was adopted.  The power of

the Supreme Court thus to examine, for itself, those whom it recommended for license, was therefore one of those "powers" which, in addition to its "jurisdiction," it was by that instrument authorized to "continue." Assuming the continuance of such mode of appointment, a statute, passed in 1903, requiring the Supreme Court to recommend certain individuals without such an examination, is an unauthorized exercise of legislative control.

2. "An act to provide for the examination, in certain cases, of applicants for admission as attorneys to the Supreme Court of this state," approved April 7th, 1903, which relieves all registered law students whose clerkships began more than three years prior to its passage from an examination provided by the rules of the Supreme Court then in force, is a special act, granting to individuals an exclusive privilege or immunity within the meaning of article 4, section 7, paragraph 11 of the state constitution.

---

Application for recommendation to the governor for licenses to practice as attorneys-at-law.

PETITION.

*To the Justices of the New Jersey Supreme Court:*

The petition of Reginald Branch, George A. Enright and John A. Hartpence respectfully shows to your honorable court:

1. That your petitioners have conformed to all the requirements for admission to the bar of this state as attorneys under the rules of this court, and also under the provisions of an act of the legislature, approved April 7th, 1903 (*Pamph. L., p.* 224), except that requirement set forth in subdivision (*d*) of rule 3, which provides that an applicant must have passed an examination equivalent to that for graduation in a public high school in this state, or to present certain certificates showing an equivalent in lieu thereof, to be approved by the state board of examiners.

2. That the qualifications above referred to appear by the certificates of practicing attorneys of this court, and that they have been inspected and approved, except as to the require-

ment above stated, by the state board of examiners as a condition precedent to admission to the attorneys' examination, as will appear by the report of said board to this court, submitted November 20th, 1903.

3. That on the first day of the present November Term of this court your petitioners applied for leave to take the attorneys' examination by virtue of the provisions of the aforesaid act of the legislature of this state, approved April 7th, 1903, which reads as follows, viz.:

"An act to provide for the examination in certain cases of applicants for admission as attorney to the Supreme Court of this state.

"*Be it enacted* by the Senate and General Assembly of the State of New Jersey:

"1. Any citizen of the State of New Jersey, above the age of twenty-one years, a registered law student in the Supreme Court, who, previous to the passage of this act, shall have served a regular clerkship in the office of a practicing attorney-at-law of the Supreme Court for a period of at least three years, and who entered upon such clerkship with the *bona fide* intention of becoming an attorney-at-law of this state, shall not be required to undergo or submit to any examination other than that required of applicants for admission as attorney at the time of the beginning of said clerkship; any subsequent enactments or rules made to the contrary notwithstanding; *provided, however,* that such applicant shall become admitted as such practicing attorney within one year from the passage of this act.

"2. All acts and parts of acts inconsistent with this act are hereby repealed, and this act shall take effect immediately.

"Approved April 7th, 1903."

4. That this court ruled that applicants for admission under the act above stated would be permitted to take the attorneys' examination with the understanding that, if successful, they should not be entitled to be recommended to the governor for attorneys' licenses by this court until the court should have passed upon the constitutionality of said act.

5. That your petitioners successfully passed the attorneys' examination at the present November Term of this court, as will appear by reference to the report of the board of examiners to this court, submitted on November 20th, 1903.

6. Your petitioners therefore apply to your honorable court for recommendation to the governor of this state for licenses to practice as attorneys-at-law and solicitors in Chancery by virtue of the provisions of the aforesaid act of April 7th, 1903, and beg leave to submit to the consideration of your honorable court citations to the authorities upon which they rely to sustain their petition.

7. If, however, after an examination of these authorities, your honorable court is of the opinion that the said act of April 7th, 1903, is in contravention of the constitution of this state, and therefore invalid, your petitioners pray that, in view of the hardships which are entailed in making rule 3, subdivision (d) retrospective, such rule may be suspended as to applicants coming within purview of the act of April 7th, 1903; or if that should not seem to your honorable court to be proper, then to allow the attorneys' examination, which has been successfully passed by your petitioners, to stand, and permit them to take the required academic examination within a reasonable time hereafter, to be fixed by your honorable court, and upon thus qualifying be recommended for licenses without being compelled to again submit themselves to the attorneys' examination.

And your petitioners will ever pray, &c.

Dated December 11th, 1903.

> REGINALD BRANCH,
> GEORGE A. ENRIGHT,
> JOHN A. HARTPENCE,
> *Petitioners.*

Before Justices GARRISON and GARRETSON.

For the petitioners, *Gilbert Collins.*

*I. The Act of April 7th,* 1903. *Pamph. L., p.* 224.

This act exempts from the preliminary academic examination required by rule 3, subdivision (*d*), of this court, such persons as had served a regular clerkship with a practicing attorney for a period of at least three years prior to its adoption, and gives such persons the right to apply for admission as attorneys in this state within one year from the date of its passage, without submitting themselves to the said academic examination.

### THE OBJECT OF THE ACT.

Its object is to enable those who had practically served the clerkship required by the rules of this court, and who had entered upon such clerkship in good faith with no academic requirements to be met, to reap the benefit of their labor, time and application, without being required to spend an indefinite further time in preparation for an academic examination not contemplated by nor required of such persons at the time they entered upon their clerkships.

### 1. IT IS JUST, FAIR AND REASONABLE.

It is a highly equitable act and seeks but to accomplish what this court might have not unreasonably done upon the adoption of the rules respecting the admission of attorneys and counsellors on March 24th, 1902. The committee appointed by this court to consider the subject of the admission of attorneys to practice made the following recommendation:

"But the preliminary examination shall not be required of any person taking the bar examination before the expiration of two terms of this court after these rules are adopted." —*Report of Committee on Bar Examinations and Admission to the Bar,* 1901, *p.* 64, ¶ 5.

Had this provision been adopted, those who now seek admission under the act of April 7th, 1903, would have had until

the November Term, 1902 (about eight months), to make their final preparation for the bar examination; each one would have been eligible for admission at that term, and no hardship would have resulted.

The rules of this court relating to the admission of attorneys had been in effect in much the same form for more than a century prior to the adoption of the rules now in force. *Rules of Supreme Court, p.* 11 (*ed.* 1885).

Yet when the present rules were adopted the court directed that they go into effect immediately, disregarding the aforesaid recommendation. In justice to those who had registered under the previous rules, a time should have been fixed within which they could have applied for admission without being compelled to conform to the requirements of the new rules. Their rights in this respect partook *of the nature of vested rights,* which the court should protect rather than destroy.

"The term *vested right,* in its application as a shield of protection, is not used in any narrow sense but as implying a vested interest of which the person cannot be deprived arbitrarily without injustice." *Myer Vest. R.* 17, § 18 (1891).

"Whenever by the voluntary acts of the parties and the force and operation of the law, whether statutory or common, as applied to those acts at the time, a right accrues to the one to have or demand something of the other, such right cannot, against the will of the party to be injuriously affected, be divested, modified or controlled by any subsequent legislation." *Id.,* § 21.

"It is said that the doctrine of the sacredness of vested rights has its root deep in the common law of England, whence so much of our own has been transplanted; and that it is a principle of that law, as old as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect." *Id.* 21, § 41. See, also, *Warshung* v. *Hunt,* 18 *Vroom* 256 (1885).

The legislature of this state recognized this principle upon the repeal of the act of February 22d, 1882 (Dunn act), by providing that any person then entered as a student at law should "be entitled to all the privileges of the same as if the

same had not been repealed" upon filing a declaration of intention to apply for admission to the bar by virtue of that act with the clerk of this court within thirty days after the passage of the repealer. *Pamph. L.* 1900, *p.* 62.

Unless the sacredness of such right be held inviolate, a student at law who commences a clerkship under the rules of this court as they exist to-day, has no assurance that he will be eligible for admission to the examination when he has completed such clerkship. He may then be required to present a diploma of a law school or university in addition to what is now required. The rules could be so amended from time to time as to forever bar out those who seek admission under them. Before they had fully conformed to one requirement another could be added, and so on *ad infinitum*.

## 2. NO HARM CAN RESULT FROM ITS OPERATION.

### (a) *It is About to Expire by its Own Limitation.*

The time within which application may be made under this act will expire shortly after the examination at the February Term, 1904. No one has yet been admitted under it and but three apply for admission at this time. The danger of an overwhelming influx of incapable attorneys by virtue of this act is therefore so slight as to be not worthy of serious consideration.

### (b) *The Present Applicants Have Demonstrated Their Fitness to Practice in the Courts.*

If this were simply an application for admission to the attorneys' examination instead of for recommendation to the governor for licenses, the question of fitness might, perhaps, be germane; but the fact that the applicants have successfully passed the attorneys' examination, which is the test for admission to the bar, should of itself be sufficient to commend them to the court as persons worthy to become practitioners therein.

3. THIS COURT HAS RECOGNIZED ACTS OF THE LEGISLATURE OF
   LIKE IMPORT, SOME OF WHICH FAIL TO SHOW THE
   SAME MERIT POSSESSED BY THIS ACT.

(a) *A Special Act Allowing Edward Livingston Price the
     Time Served in the War of the Rebellion in Lieu of
     so Much Clerkship.    Pamph. L.* 1866, *p.* 569.

This act rendered inoperative, so far as Mr. Price was con-
cerned, the then rule 3 of this court. *Rules of Supreme
Court, p.* 11 (*ed.* 1885).

Nevertheless this court admitted Mr. Price as an attorney
by virtue of this act at the June Term, 1866. *Id., Append.,
p.* 125.

(b) *The Act of February 22d,* 1882 (*Dunn act*).
     *Pamph. L.* 1882, *p.* 22.

Prior to the passage of this act this court held that John T.
Dunn was not eligible for admission to the attorneys' exami-
nation, because he had not served a *bona fide* clerkship as re-
quired by the rules of the court. *In re John T. Dunn,* 14
*Vroom* 359 (1881).

The legislature thereupon passed the act above referred to,
which provided that certain persons, upon complying with the
terms of the act, should be admitted without having served
any specified period of clerkship. Term after term for
twenty-one years, down to and including the present Novem-
ber Term, 1903, this court has admitted attorneys by virtue
of this act, which abrogated the effect of rule 3, requiring a
four years' clerkship as a condition of eligibility for ad-
mission. *Rules of Supreme Court, p.* 11 (*ed.* 1885).

This act was repealed by *Pamph. L.* 1900, *p.* 62.

(c) *The Act of April 30th,* 1894.    *Pamph. L.* 1894, *p.* 161.

This act provided that attorneys and counsellors from other
states, possessing certain qualifications, should be admitted as

attorneys and counsellors in this state without being required to submit themselves to the bar examinations—simply upon motion in open court. This contravened rule 2, which provided that *"no person* shall be recommended for license as an attorney, unless he shall first submit himself to an examination as hereinafter provided;" and also rule 6, providing that *"no person* shall be recommended for license to practice as a counsellor-at-law in this state, unless he shall first submit himself to examination, * * * nor * * * until he shall have practiced *in this court* as an attorney for the space of three years at least." *Rules of Supreme Court, pp.* 11, 13 *(ed.* 1885).

This court, however, recognized the power of the legislature to make such regulation, and while the act was in force admitted a number of attorneys and counsellors from other states upon motion.

This act was repealed by *Pamph. L.* 1895, *p.* 359.

(d) *An Act to Enable Women to Practice Law.*
*Pamph. L.* 1895, *p.* 366.

Upon the application of Mary Philbrook for admission as an attorney, this court (Depue and Reed, Justices) held,

"PER CURIAM.

"We are of the opinion that *until the legislature grants the privilege* to women of becoming attorneys the weight of reason and authority is against the existence of the right." Decided at June Term, 1894; not reported.

If it were an inalienable prerogative of this court to prescribe the requirements for admission of attorneys, why was it necessary to wait until the legislature granted this privilege? Its own rule would have been as effective. On the other hand, did not the court, by this action, acknowledge the absolute power of the legislature to regulate such admission? However this may be, after the passage of the above act, this court admitted women to practice as attorneys,

without questioning their right, the last having been admitted at the June Term, 1902, after the present rules of the court relating to the admission of attorneys had gone into effect.

The act of April 7th, 1903, does not compel this court to accept war service in lieu of clerkship; to admit applicants who have served no clerkship; nor to admit them without submitting themselves to examination. Neither does it seek to reduce the period of clerkship now required, nor to in any way interfere with the rules of this court, except that which requires an academic qualification not contemplated at the time when the clerkships of those who now seek admission under this act began. Nor does it fix an unreasonable or objectionable time limit at either end, *i. e.*, in regard to the clerkship served or the time within which application must be made. It does not provide that any person who may have registered one day before the passage of the act shall have the benefit thereof, but recognizes the hardship which results to those who had served a clerkship of three years and were then rendered ineligible because of subsequent requirements. Nor does it fix an unlimited time within which such persons may apply for admission. All who are entitled to its benefit ought reasonably to prepare for the examination in the period given—one year from the date of its passage.

Regardless of the question of whether or not the act of April 7th, 1903, interferes with an inherent prerogative of this court, in view of the attitude of the court toward similar acts heretofore, it ought not to refuse to extend to this act the consideration which it has extended to others less meritorious.

"Whether the constitution does not entrust the rule of admission to the bar, as well as expulsion from it, exclusively to the discretion of the courts"—*Quære.*

"The legislature has, indeed, from time to time assumed power to prescribe rules for the admission of attorneys to

practice. When these have seemed reasonable and just, it has generally, we think, been the pleasure of the courts to act upon such statutes, in deference to the wishes of a co-ordinate branch of the government, without considering the question of power." *In re Goodell, 39 Wis.* 239 (1875).

## II. *Has the Legislature of this State the Power to Regulate and Control the Admission of Attorneys and Counsellors?*

### 1. SUCH POWER IS NOT INHERENT IN THE COURTS, BUT HAS BEEN THE SUBJECT OF STATUTORY REGULATION AND CONTROL FROM ITS INCEPTION.

. *In England.—Pollock & Maitland's "History of English Law,"* vol. 1, pp. 191, 194, 195, 196; *vol.* 2, *p.* 224 (1895); 1 *Tidd Prac.* (3d Am. ed.) *60 (1840); 1 *Bac. Abr., tit.* "Attorneys," 474 et seq., and notes; *Bouvier (Am. ed.,* 1868); *Liv. L. Reg.* 30 (1856–58), and notes; *King* v. *Benchers of Gray's Inn,* 1 *Doug.* 354 (1780); *King* v. *Benchers of Lincoln's Inn,* 4 *Barn. & C.* 855 (1825). An ancient authority, written long before the conquest (1066), declares that "all may be attornies which the law will permit." *Horne Mir.* (*Eng. ed.*) 125 (1768). And later it was held that "the statute is inexorable." *Ex parte Rowle,* 2 *Chit.* 61 (1820).

The history of the admission of attorneys is exhaustively considered in the brief of Theodore W. Dwight, in *In re Cooper,* 22 *N. Y.* 67 (1860).

The early English statutes are reviewed in *Weeks Attor.* (2d ed., 1892) 91, § 44.

Admission in England now regulated by 6 *&* 7 *Vict., c.* 73 (1843); *Id.* 112, § 60.

In English colonial courts by 20 *&* 21 *Vict., c.* 39, *&c.; Id.* 120, § 62.

In Ireland, by the Attorneys' and Solicitors' act for Ireland, &c. (1866). 20 *&* 21 *Vict.* 120, § 63.

In Scotland, by 23 *&* 24 *Vict., c.* 127, *&c.; Id.* 128, § 64.

The inherent right of courts to admit or deny admission of attorneys is strikingly negatived by 6 & 7 *Vict., c.* 73, § 27 (1843); *Id.* 93.

*United States Supreme Court.—Ex parte Secombe,* 19 *How.* 13 (1856), per Taney, C. J.; *Ex parte Garland,* 4 *Wall.* 334, 379 (1866), per Field, J.; *Bradwell v. State,* 16 *Id.* 142 (1872), per Bradley, J., affirming 55 *Ill.* 535; *Ex parte Robinson,* 19 *Wall.* 510 (1873), per Field, J.

*Massachusetts.*—3 *Griff. L. R.* 485 (1821); *Randall v. Brigham,* 7 *Wall.* 539 (*United States Supreme Court,* 1868), per Field, J.; *Pub. Stat.* 1882, *p.* 913.

*New York.—In re Brewer,* 3 *How. Pr.* 169 (*Supreme Court,* 1847); *In re Cooper,* 22 *Id.* 67 (*Court of Appeals,* 1860); *In re John Percy,* 36 *Id.* 653 (1867); *In the matter of Attorney,* 83 *Id.* 166 (1880); *In re O'Neill,* 90 *Id.* 585 (1882).

*New Hampshire.*—In sustaining the right of women to be admitted as attorneys under the statute, this subject is exhaustively treated by Chief Justice Doe, in *Ricker's Petition,* 66 *N. H.* 207 (1890).

*Maryland.—In re Taylor,* 48 *Md.* 33 (*Court of Appeals,* 1877); *In re Maddox,* 93 *Id.* 728, 729, &c. (1901).

*California.—Cohen v. Wright,* 22 *Cal.* 293 (1863); *Ex parte Yale,* 24 *Id.* 244 (1864).

*Indiana.—In re Petition of Leach,* 134 *Ind.* 667 (1893).

Admission to the bar is subject to statutory regulation in the following states and territories:

Colorado, Connecticut, Dakota, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, North Carolina, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming. *Weeks Attor.* (*2d ed.,* 1892) 142, note. See, also, *State v. Garesche,* 36 *Mo.* 258, 261 (1865).

2. NEITHER THE CONSTITUTION OF 1776 NOR THAT OF 1844
OF THIS STATE VESTS IN THE SUPREME COURT THE IN-
ALIENABLE RIGHT TO REGULATE AND CONTROL THE
ADMISSION OF ATTORNEYS AND COUNSELLORS.

(a) *The Proprietary Government* (―― 1702).

"By the concessions of Berkeley and Carteret, the original proprietors of New Jersey, the power of erecting courts and defining their jurisdiction was conferred upon the general assembly." *Field's "Provincial Courts of New Jersey"* 5; *"Collections of New Jersey Historical Society,"* vol. 3 (1848).

"In 1694, we find an act of assembly for the regulation of attornies at law within the province, and which prohibited justices of the peace, sheriffs and clerks of the courts, from acting as attornies under the penalty of twenty pounds. And in 1698, Governor Basse was instructed to procure the passage of a law, by which no attorney or other person should be suffered to practice or plead for fee or hire in any court of judicature, *unless he had been regularly admitted to practice* by license from the governor." *Id.* 23.

(b) *From the Surrender of the Proprietors to the Revolution* (1702–1776).

"It is then to the ordinances of the governor and council that we are to look for the frame and constitution of our courts after the surrender. The first ordinance for the establishment of courts of judicature in the province of New Jersey was that of Lord Cornbury in 1704." *Field's "Provincial Courts of New Jersey,"* 42.

"The ordinance of 1704 is the foundation of them all." *Clevenger & Keasbey's "Courts of New Jersey"* 86 (1903).

The ordinance of Lord Cornbury empowered the judges of the several courts to make "such rules and orders for the more regular practicing and proceedings" therein as the judges "of the several courts of Queen's Bench, Common Pleas and

Exchequer in England legally do." *Field's "Provincial Courts of New Jersey"* 261.

The ordinance of Governor Hunter (1714) provided that "all and every the justices and judges of the said several courts are sufficiently empowered and authorized to make, order and establish *such rules and orders* for the more regular proceedings in the said courts *as justices and judges in England may lawfully do,* any former ordinance or establishment of courts of judicature to the contrary hereof in any way notwithstanding; all which are from hence-forward declared to be null and void by these presents." *Field's "Provincial Courts of New Jersey"* 268.

"These courts continued without any essential change to the revolution." *Field's "Provincial Courts of New Jersey"* 45, note 2; *Clevenger & Keasbey's "Courts of New Jersey"* 91.

There were no changes in the jurisdiction of the Supreme Court by the ordinances of 1723, 1724, 1725 and 1728, and, so far as this question is concerned, none by the ordinance of 1751. *Clevenger & Keasbey's "Courts of New Jersey"* 93, 95, 96 and 97.

"And if the question were now asked, what is the jurisdiction of the Supreme Court of the State of New Jersey as at present constituted, the only answer that could be given would be in the language of Lord Cornbury's ordinance: they have all the jurisdiction which the courts of Queen's Bench, Common Pleas and Exchequer in England have, or ought to have." *Field's "Provincial Courts of New Jersey"* 44.

So far as the records show, the first attorney and counsellor-at-law in New Jersey was admitted in 1704—the date of Lord Cornbury's ordinance. *Rules of Supreme Court, Append.* 57 (*ed.* 1885).

"Prior to 1767 the admissions to practice as an attorney and counsellor-at-law were undistinguished." *Ibid.*

Nevertheless, during the period in which the various ordinances of the provincial governors were in force (1704–1776) and while by virtue of such ordinances the Supreme Court was

empowered to make "such rules and orders * * * as justices and judges in England might lawfully do," the assembly regulated the admission of attorneys-at-law by statute.

"In 1733, during the administration of Governor Crosby, it was provided by an act of assembly that no person should be admitted to practice as an attorney-at-law but such as had served an apprenticeship of at least seven years with some able attorney licensed to practice, or has pursued the study of the law for at least four years after coming of full age." *Field's "Provincial Courts of New Jersey"* 132.

It was the subject of legislative discussion upon a number of occasions. 13 *New Jersey Archives* (1st Series), *pp.* 208, 209, 211, 219, 318, 319; 15 *Id., pp.* 295, 296, 303.

But, in order to determine conclusively what power the Provincial Supreme Court possessed in this respect, it is necessary to ascertain what power the courts in England possessed, for their powers were declared to be identical. The Supreme Court of the province could make whatever rules the courts in England could lawfully make, and, *e converso,* any limitation upon the power of the English courts in relation thereto applied to the Provincial Court.

"Each of these judicial institutions (the constitutional courts), with the exception of the county courts, and those subordinate establishments styled inferior courts, has descended to us from the proprietary and provincial governments with no observed change except as to their modes of procedure, and inasmuch as each of them is the exact counterpart of an English original, the particular jurisdiction of each is readily ascertainable by a reference to that of the tribunal of which it is a copy." *Conger* v. *Convery,* 23 *Vroom* 439 (1890), per Beasley, C. J.

It has been shown that in England the power to prescribe the requirements and qualifications for admission of attorneys was not inherent in the courts, but was from the beginning subject to statutory regulation and control. This being true, it follows that the power of the Provincial Supreme Court

was restricted by this same limitation. And that the colonial courts might be regulated by statute in England, is shown by the fact that to the present time England so controls her colonial courts. *Weeks Attor.* (2d ed., 1892) 120, 128, §§ 62, 63, 64.

Therefore, during the period of the proprietary government (—— 1702), and during the provincial or colonial period (1702–1776) the right to regulate and prescribe the requirements for the admission of attorneys and counsellors cannot be regarded as being an inherent power resulting from the nature and organization of the Supreme Court, but a power entrusted to it by ordinance and statute.

(c) *From the Adoption of the Constitution of 1776 to 1844.*

Section 21 of the constitution of 1776 provides "that all the laws of this province, contained in the edition lately published by Mr. Allinson, shall be and remain in full force *until altered by the legislature of this colony* (such only excepted as are incompatible with this charter)."

And section 22, "that the common law of England, as well as so much of the statute law, *as have been heretofore practiced in this colony,* shall still remain in force until they shall be *altered by a future law of the legislature;* such parts only excepted as are repugnant to the rights and privileges contained in this charter; and that the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal, forever."

This preserved inviolate the right of trial by jury, *without repeal, forever.* But nothing else is so mentioned in this section. So far as the Supreme Court is concerned, no new powers were created, nor were the existing powers vested. A "future law of the legislature" could have altered or abolished them all; for whatever had been the law of the land prior to this constitution—whether the common law of England, statute law of England or statute law of the colony—was still subject to alteration by the legislature.

There is no specific reference to the jurisdiction or powers of the Supreme Court in this constitution. But the legislature seems to have regulated it later by statute.

### THE STATUTE OF OCTOBER 2D, 1776.

"That the several courts of law and equity of this state shall be confirmed and established, and continued to be held with like powers under the present government, as they were held at and before the declaration of independency, lately made by the honorable the continental congress." *Pat. L.,* *p.* 38.

This statute was merely confirmatory of the powers and jurisdiction of the provincial courts, and vested no existing powers nor created no new ones.

(d) *From the Adoption of the Constitution of* 1844 *to the Present Time.*

Unless the constitution of 1844 vests in the Supreme Court the inalienable prerogative of regulating and controlling the admission of attorneys and counsellors, such admission must remain wholly subject to statutory regulation.

The provision of the constitution bearing upon this subject is contained in article 10, section 1, which provides that "the common law and statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be *altered or repealed by the legislature;* * * * the several courts of law and equity, except as herein otherwise provided, shall continue with the like powers and jurisdiction as if this constitution had not been adopted."

Article 6, section 1, vests the judicial power in certain enumerated courts, among which is the Supreme Court.

This constitution does not *continue* the *powers and jurisdiction* of the courts, but *continues the courts* with *like powers and jurisdiction* as if the constitution had not been adopted.

The constitution conferred no new nor greater powers upon the Supreme Court than it possessed prior to the adoption thereof. Its powers are declared to be the same *as they would have been if that constitution had not been adopted.*

The constitution vested in the Supreme Court such powers as it possessed, but it did not vest in this court powers which it *did not* possess. If, prior to the adoption of this constitution, it was an inherent power of this court to prescribe the qualifications for admission of attorneys, regardless of statutory authority, then such power has been vested in the court beyond the reach of the legislature. But if this court merely exercised a function assigned or entrusted to it by legislative authority, as a tribunal most appropriate in which to repose such an office, subject, however, to regulation, control or divestment by the same authority which vested it, then that is the extent of the power which this court now possesses in this respect, for its powers are to *continue* as if this constitution *had not been adopted.*

"Although the legislature cannot limit a right given by the constitution, it may surely impose conditions upon privileges granted by itself. This is so plain as to admit of no debate." *In re Cooper,* 22 *N. Y.* 90 (1860).

"There are two primary principles which are always to be borne in mind in the discussion of every question touching the limitations of the authority of the legislature of the state. The first of these is that the legislative body is supreme, in every respect, except in the enumerated instances of constitutional restraints; and next, that such restraints cannot be imposed but by plain language or by implication necessarily springing from the co-ordination of the several parts of the established system of government." *Harris* v. *Vanderveer's Executor,* 6 *C. E. Gr.* 425 (1869), per Beasley, C. J.

"Every intendment must be in favor of legislative power. Learned judges have, with great unanimity, laid down a rigid rule on this subject. Chief Justice Marshall, in 6 *Cranch* 128; Chief Justice Parsons, in 5 *Mass.* 534; Chief Justice

Tilghman, in 3 *S. & R.* 72; Chief Justice Shaw, in 13 *Pick.* 61, and Chief Justice Savage, in 1 *Cow.* 564, have, with one voice, declared that 'it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers and its acts to be considered void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.' " *Id.* 440, per Van Syckel, J.

"It is our duty to adjudge all acts of the legislature which are not clearly in violation of the constitution valid." *Ross* v. *Freeholders of Essex et al.,* 40 *Vroom* 291 (1903), per Dixon, J.

"Although the appointment of attorneys has usually been entrusted in this state to the courts, it has been, nevertheless, both here and in England, uniformly treated not as a necessary or inherent part of their judicial power, but as wholly subject to legislative action." *In re Cooper,* 22 *N. Y.* 90, 91 (1860).

That this court has so regarded this question is to be inferred from its attitude on numerous occasions in the past. These have already been considered. See *ante p.* 544.

This is the view also adopted in England and in almost all of the United States. See *ante p.* 547.

Nor is this view controverted in numerous cases in this state in which the inherent prerogatives of the constitutional courts have been considered. *State, Dufford, pros.,* v. *Decue,* 2 *Vroom* 302 (1865); *Harris* v. *Vanderveer's Executor,* 6 *C. E. Gr.* 424 (1869); *Traphagen* v. *West Hoboken,* 10 *Vroom* 232 (1877); *Jersey City* v. *Lembeck,* 4 *Stew. Eq.* 255 (1879); *Green* v. *Jersey City,* 13 *Vroom* 118 (1880); *Flanagan* v. *Plainfield,* 15 *Id.* 118 (1882); *Dodd* v. *Lyon,* 20 *Id.* 229 (1886); *Conger* v. *Convery,* 23 *Id.* 439 (1890); *Central Railroad Co.* v. *Tunison,* 26 *Id.* 561 (1893); *McCullough* v. *Essex Circuit Court,* 30 *Id.* 103 (1896); *Kenny* v. *Hudspeth,* 30 *Id.* 320 (1896); *Flanigan* v. *Smelting Co.,* 34 *Id.* 647

(1899) ; *Green* v. *Heritage,* 35 *Id.* 567 (1900) ; *Ross* v. *Freeholders of Essex et al.,* 40 *Vroom* 291 (1903).

The constitutional powers which this court has so jealously guarded are those "which *inhered* in the court at the formation of the constitution," the prerogative writs, the "arms of the court," without which it would cease to be a court, and to destroy which would be to destroy the court. *Traphagen* v. *West Hoboken, supra* (at *p.* 235).

The language of Chief Justice Beasley in an earlier case in the Court of Errors and Appeals is to the same effect. *Harris* v. *Vanderveer's Executor, supra* (at *p.* 427).

Yet is has been held that even these powers, vested so inalienably, may be *regulated* by the legislature. *Green* v. *Jersey City,* 13 *Vroom* 118 (1880) ; *Warshung* v. *Hunt,* 18 *Id.* 258 (1885) ; *Van Anglen* v. *Bayonne,* 27 *Id.* 465 (1894) ; *Ocean City Railroad Co.* v. *Bray,* 10 *Dick. Ch. Rep.* 106 (1896).

This was practically the view taken by Chief Justice Beasley, in *Harris* v. *Vanderveer's Executor, supra,* holding that the jurisdiction of the constitutional courts is not inflexible.

"From the earliest times every session of the legislature has added to the subjects of judicature, and the jurisdiction of our courts has been adjusted to this ever-varying condition of things. I will instance one case out of a multitude. In the year 1848 the legislature gave a remedy by action in cases of death resulting from a wrongful act or neglect. This was the creation of new causes of action. The Supreme and Circuit Courts have taken cognizance of this class of cases. Can anyone pretend that this court must not finally adjudge the law of such cases?" *Harris* v. *Vanderveer's Executor, supra* (at *p.* 429).

Now, conversely, let us presume that the act of 1848 had been passed in 1840 instead of 1848, and that the Supreme and Circuit Courts had taken cognizance of the class of cases to which it gave rise. Can it be contended that by the constitution of 1844, which vested the existing jurisdiction of

the Supreme Court, such act would thereby have become unalterable or irrepealable, because such action on the part of the legislature would take from the Supreme Court so much of its jurisdiction?

Attorneys-at-law are not officers of the court, inherent and indispensable, without which the court would cease to be a court. Indeed, as has been shown, courts were in existence for centuries before attorneys were known or recognized, the parties themselves being required to appear in person to prosecute or defend their suits. By royal prerogative and by statute their *status* was established, and later the courts were entrusted with their admission to practice. But this trust must be held to have always been subject to the control and regulation of the authority by which it was created and conferred.

Can it be contended, therefore, that the power over this matter, exercised by this court prior to the constitution of 1844, was put beyond the reach of the legislature by that constitution, any more than the Death act would have been had it been enacted before that date, or a multitude of other acts by which jurisdiction was necessarily conferred upon this court? Both the constitution of 1776 and that of 1844 specifically provide to the contrary.

Our contention, therefore, is that it is the right of the legislature to regulate and control the admission of attorneys and counsellors-at-law in this state; that the legislature has the power to prescribe the requirements and qualifications incident to their admission; that the control thereof hitherto exercised by this court by virtue of the authority of ancient ordinances and statutes was always limited by this right of statutory regulation, restriction and alteration, and that the authority by which the power was originally conferred may regulate, control or divest it.

Hence the act of April 7th, 1903, is not in derogation of any inherent, constitutional prerogative of this court, and should therefore stand.

### III. Suspension of Rule 3, Subdivision (d).

[Section 7 of petition prays that above rule be suspended as to all students-at-law who had registered prior to its adoption.]

The courts in England have extended grace in cases attended with circumstances of peculiar hardship. *William Fletcher's Case,* 2 *H. Bl.* 734 (1770)·; *Richard Carter's Case, Id.* 957 (1774).

At the February Term, 1858, this court suspended rule 6, which required applicants for counsellors' licenses to have practiced as attorneys for a period of at least three years prior thereto (*Rules of Supreme Court, p. 13, ed.* 1885), and admitted J. E. Carey as both an attorney and counsellor-at-law. *Id., App., p.* 47 (*ed.* 1900).

Similar action was taken at the February Term, 1865, admitting William G. Cumming (*Rules of Supreme Court, App., p. 50, ed.* 1900) ; at the June Term, 1865, admitting Leon Abbett (*Id., p.* 43) ; at the November Term, 1871, admitting Th. S. Alexander (*Id.*), and at the November Term, 1891, admitting James Parker (*Id., p.* 124).

Present rules 3, subdivision (e), and 5½, have been suspended in numerous instances since the adoption thereof, on March 24th, 1902, allowing certificates to be filed *nunc pro tunc.* See *Minutes of Supreme Court, November Term,* 1902; *February Term,* 1903; *June Term,* 1903; *November Term,* 1903, &c.

### IV. The Act of April 7th, 1903, is Not a Private, Local or Special Law Within the Prohibition of Article 4, Section 7, Clause 11 of the Constitution of this State.

Private, local or special laws are not prohibited in this state except in the instances specially enumerated in the constitution. The only constitutional prohibition within which this act could be included is found in the clause above cited. It provides that the legislature shall not pass private,

local or special laws "granting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever."

This act does not grant to any *individual* any *exclusive privilege or immunity.*

A striking instance of that kind is the act allowing to Edward Livingston Price the time served in the war of the rebellion in lieu of so much clerkship, cited on *ante p.* 544. *Pamph. L.* 1866, *p.* 569.

Another would be an act providing that John Doe be admitted to practice as an attorney-at-law and solicitor in Chancery upon motion to that effect being made before the Supreme Court.

Or an act which provided that John Doe be permitted to practice as an attorney-at-law and solicitor in Chancery, and that no other person have that privilege during the lifetime of said John Doe.

Or an act so framed as to be general in its terms, but skillfully worded so as to apply to but one person, corporation or association.

An exclusive privilege within the meaning of this clause of the constitution was so defined in *State* v. *Post,* 26 *Vroom* 264 (1893).

This case declared unconstitutional an act which conferred upon certain individuals the right to plant oysters on riparian lands of this state and gave to those persons the exclusive right to gather the product of the oyster beds.

In this same case it was held that this section of the constitution had direct reference to *grants,* corporeal in their nature, which amounted to monopolies. "Prior to the adoption of the amendments of the constitution, there had been conspicuous instances in which the legislature had made valuable *grants* to individuals and corporations by special laws. *The purpose of the constitutional clause under consideration was to interdict all legislation of that character.*" *State* v. *Post, supra* (at *p.* 265).

This was the view taken by the eminent members of the bar who compiled the general statutes of 1895. The side

note to this section of the constitution is "monopolies." *Gen. Stat., p. 55.*

This act does, it is true, confer certain benefits upon a *class* of persons not granted to others. In numerous cases the courts of this state have held that when classification is resorted to in order to give a general effect to a law, certain principles must be observed. This doctrine is well established and familiar.

In the very recent case of *Riccio* v. *Hoboken,* 40 *Vroom* 649, decided by the Court of Errors and Appeals on September 21st, 1903, it was held, in disposing of the question of classification for the purpose of school legislation, that "a legislative classification of school districts, *proceeding on lines germane to the objects and purposes of the law,* may serve to make general an enactment providing for the management and support of the schools."

From this it is to be inferred that a classification which is germane to the object of the act is valid.

This view was taken by Chief Justice Beasley in a case in the Court of Errors and Appeals involving a construction of the section of the constitution now under discussion. An act relating to railroads had been passed by the legislature imposing certain conditions, but containing a proviso that those restrictions should not apply to "any seaside resort railroad company * * * not exceeding four miles in length," &c. It was contended that this act conferred upon an arbitrary class of railroads an exclusive privilege or immunity within the interdiction of the constitution. The Chief Justice says: "Nor does it appear to us that it was legally objectionable for the legislature to constitute this special class by a reference to the length of the roads for the purpose of classification. *The roads could be grouped in no other way,* and, *looking at the definition of the objects to which this proviso is to be applied,* we cannot say that it is either too broad or too narrow, for it appears *to embrace the whole of the class to which it properly relates and nothing more."* *D., B. & C. M. R. R. Co.* v. *Markley,* 18 *Stew. Eq.* 152 (1888).

An act passed by the legislature of this state provided, in a manner somewhat similar to the act under discussion, that race-courses organized prior to January 1st, 1893, might carry on their business by complying with certain conditions, while those organized after that date were required to comply with certain other conditions. This act was attacked as special legislation.

Mr. Justice Lippincott, speaking for the Supreme Court, held that "to make a classification good it must be founded upon differences and characteristics sufficiently marked and important *to make them naturally a class by themselves.* There are no qualities in race-courses which are sufficiently marked and important to distinguish those in use prior to January 1st, 1893, from those set up after that date." *O'Connor* v. *Elizabeth, 27 Vroom* 81 (1893).

Manifestly, there are differences and characteristics sufficiently marked and important to make those persons who entered upon a course of legal training with specified regulations to be met, and who are compelled to qualify under subsequent and radically different regulations, to make them "a class by themselves," and to "distinguish them" from those who began the study of the law at a later date with the subsequent regulations distinctly in view.

The avowed intention of the legislature in enacting the act of April 7th, 1903, was to preserve a right that partook of the nature of a *vested right,* vested in certain individuals. This, in itself, rendered the act operative upon a limited class of persons only, namely, those in whom the right vested. The most general classification possible, then, was one which would preserve this right where it existed, and at the same time not extend a privilege to other persons who were in no way entitled to it. These persons, therefore, as remarked by Chief Justice Beasley, *supra,* "could not be grouped in any other way."

As discussed on *ante p.* 546, the act could have been made more general in its application by extending its benefits to those students-at-law who had been registered as such but

*one day* prior to the passage of the act, and the time within which those entitled to its benefits might apply for admission need not have been limited to one year. But in a highly equitable manner the legislature took into consideration the fact that but slight inconvenience would result to those who had pursued but a brief period of study, and recognized the great hardship that resulted to those who had practically pursued the clerkship required by the rules of this court. Then, as such persons, if pursuing their legal studies in good faith, should be prepared to take the bar examination within a certain period, and as it would be unfair to the court and to the bar to leave this option open indefinitely, the time within which application could be made was limited to a period which, in addition to that already served, would make up a period of clerkship equivalent to that required by the rules in effect when they entered upon their legal studies.

The object of this act could not be more fair; the classification could not be more germane to the object of the act, and the class could not be grouped in any other way.

Clearly this act does not *grant* an *exclusive privilege or immunity* to any *individual* nor to any group of individuals forming an arbitrary or illegal class in view of the decisions upon this subject by the courts of this state.

The opinion of the court was delivered by

GARRISON, J. The legal question raised upon this application is whether the petitioners are entitled, as of right, to the recommendation of this court to the governor for licenses as attorneys-at-law, notwithstanding they have not submitted themselves to one of the examinations required by the rules of the court adopted March 24th, 1902. Dispensation from such examination is claimed by the petitioners by force of an act of the legislature approved April 7th, 1903, recited at length in the petition. If this legislation has the force thus ascribed to it it is because it abrogates, *pro tanto,* the rules made by this court for the examination of applicants for its recommendation. The question, therefore, is whether the statute has this effect.

In approaching this question it should be noted, in aid of precision, that the act in question is not only addressed solely to the granting of an immunity to a specified class of indi-· viduals, but that it is only by reading the practice and rules of this court into such act that it can be construed into a requisition to this court to recommend to the governor the individuals that come within the class specified, notwithstanding they have not submitted themselves to an examination with respect to their educational qualifications. Unless this force be attributed to the act, the present application is pointless.

Assuming such to be the construction of this statute, the question that is presented is not whether the recommendation of this court to the governor may be dispensed with by the legislature, but whether, assuming the necessity of such recommendation, the Supreme Court may be required to grant it to persons whose educational qualifications it is prohibited by the legislature from testing. In fine, the question is whether the court, as a recommending body, may be required by the legislature to base its certificate to the governor as to the educational qualifications of those whom it recommends upon a legislative immunity from, instead of a submission to, an examination designed to test such qualifications.

In order to see the exact nature and extent of such immunity it must be recalled that prior to March 24th, 1902, when the recent rules were adopted, a law student who was not a college graduate must, before making his application for admission to his bar examination, have served a clerkship of four years. The effect of the adoption of the rules in question was to wipe out the four years' clerkship entirely, doing away at the same time with the distinction theretofore accorded to a college diploma, and to substitute, as to all registered law students, a three years' clerkship, plus an educational test, in which high school graduations were assimilated with college diplomas, and an examination which should be the equivalent of that required for high school graduation permitted to students who were graduates neither of high

schools nor colleges.  As to college graduates this left the
matter as it had been before, but as to those who previously
had been four-year students the new rule struck off one year
from the term of clerkship previously prescribed, substitu-
ting, however, in its stead, an educational test that placed
such students upon a plane of exact equality with high school
and college graduates.  The effect, therefore, of the new
rules upon the petitioners was to lessen their term of re-
quired clerkship from four years to three, provided they
passed an examination equivalent to that required for high
school graduates, provisions for holding which were made
by the rules.

Such being the earlier rules in force at the time these peti-
tioners began their clerkships and the later ones in force at
the time of the passage of the statute in question, we are in
a position to see what was the precise privilege or immunity
granted by the statute under consideration to the class of
persons within its purview, which, in a constitutional sense,
includes all registered law students whose clerkships had, at
the time of the passage of the act, to wit, April 7th, 1903,
been running for three years—that is, all who on or before
April 6th, 1900, had begun the service of such clerkship.
Now, a clerkship that dated from April 6th, 1900, had, as
we have seen, four years to run, so that when this statute
provided, with respect to such clerkship, that if it had existed
for three years prior to the passage of the act it should
entitle the student to the same *status* as if he had taken the
preliminary examination from which he was absolved by the
act itself, an out-and-out immunity was granted not only
from the examination provided for by the rules of this court,
but also from one year of the term of clerkship provided for
by the rules in force at the time such clerkship began, leaving
as a net gain to the class included within this statute one
year of actual clerkship, for which they have given no equiva-
lent whatsoever.

That this statute, therefore, is one granting a privilege or
immunity, is not to be questioned.  That it grants such privi-

lege or immunity to those individuals alone who are included within its classification, cannot be questioned. Hence, as to all not within such classification, the privilege in question is an exclusive one, within the meaning of article 4, section 7, paragraph 11 of the state constitution, which prohibits the legislature from granting to any individual any exclusive privilege or immunity whatever. The controlling question, therefore, is whether this statute is, in a constitutional sense, a special law, or whether it is general in the sense that it is "founded upon differences and characteristics sufficiently marked and important to make them naturally a class by themselves."

The main feature of the classification adopted by the statute is a date that is related to the time of the passage of the act itself, namely, three years prior thereto, so that such registered law students only whose clerkships began three years prior to April 7th, 1903, to wit, on April 6th, 1900, can ever enjoy the privilege or immunity created by the statute. The selection of the class thus delimited is justified in the brief of counsel as follows:

"The avowed intention of the legislature in enacting the act of April 7th, 1903, was to preserve a right that partook of the nature of a _vested right,_ vested in certain individuals. This, in itself, rendered the act operative upon a limited class of persons only, namely, those in whom the right vested. The most general classification possible, then, was one which would preserve this right where it existed and at the same time not extend a privilege to other persons who were in no way entitled to it."

This application of the doctrine of "vested rights" proceeds apparently upon the notion that the original term of the clerkships upon which the statute operated was three years, and therefore that the super-imposition of an examination not contemplated by such students at the time they entered upon their clerkships was an unwarranted infringement of their rights; but this entirely overlooks the fact above pointed out, namely, that the so-called "vested right" of such

student was to be recommended at the expiration of a four years' clerkship and not at the end of three years of such service. Without reference therefore to the fundamental fallacy involved in this conception of vested rights the theory itself totally fails to sustain the classification even upon the assumption of its soundness. No reason is advanced, and none I venture to say is conceivable, why a student who, on April 6th, 1900, entered upon a four years' term of clerkship, should be recommended for license after serving but three years of such term, which would not be equally applicable to a student whose clerkship dated from April 8th instead of April 6th. The dispensation of one year from the term of required clerkship would in either case be a pure gratuity for which no more reason exists in one case than in the other.

I am therefore constrained to the conclusion that the classification adopted by this statute is arbitrary and illusory, and that the immunity granted by it to the class thus selected is contrary to the plain interdict of the constitution.

If, however, for the purpose of entertaining the argument mainly relied upon in the petitioners' brief, we assume that the statute under consideration is free from the vice just imputed to it, we find such argument to be as follows:

Originally, in England, the right to appoint attorneys was a royal privilege. 1 *Pollock & Maitland's "History of English Law,"* p. 191; 2 *Id.,* p. 224.

As early, however, as the thirteenth reign, Edward I., the exercise of this right was regulated by parliament.

"We may infer," says the authority last cited, "that already, before 1292, these practitioners had acquired an exclusive right to be heard on behalf of others. In that year King Edward directed his justices to provide for every county a sufficient number of attornies and apprentices from among those the best, the most lawful and the most teachable, so that king and people might be well served." 1 *Pollock & Maitland's "History of English Law,"* p. 194.

The direction referred to was the statute of *Westminster II., c.* 10 (1285).

So that Tidd says: "Before the statute of *Westminster II.* (13 *Edw. I.*) *c.* 10 (1285) the parties to a suit could not have appeared by attorney without the Queen's special warrant, by writ or letters patent; but must have attended the court in person. By the statute 3 *Jac. I., c.* 7, § 2, it was enacted that 'none should from thenceforth be admitted attornies in any of the King's courts of record at Westminster but such as had been brought up in the same courts or otherwise well practiced in soliciting causes; and had been found by their dealings to be skillful and of honest dispositions.' "

And Gilbert, in his "History of Civil Actions," says: "Before the statute of *Westminster II., c.* 10, all attornies were made by letters patent under the broad seal, commanding the justices to admit the person to be his attorney. If such letters patent could not be obtained the persons were obliged to appear each day in court in their proper persons."

Numerous other acts of parliament showing the course of regulative legislation of this subject are cited in *Liv. L. Reg.* 30, and notes (1856–1858), with the summary that "long after the general right to appear by attorney had been recognized by law the class of persons on whom the duties of attorneys ordinarily devolved were without any legal regulation, though it would seem to have been competent to the presiding officers of any particular court to exercise a discretionary power in admitting persons to act in that capacity. With regard to attorneys of the Superior Courts at Westminster, it was provided, as far back as the 20 *Edw. I.* (1292), that judges should select from every county a number of attorneys and apprentices, of the best and most apt for their learning and skill, to do service in the courts. By 15 *Edw. II., c.* 1 (1322), the Barons of the Exchequer were restrained from admitting attornies except in pleas before them, and their clerks and servants were prohibited from admitting attornies, the power being reserved to the Chancellor and the Chief Justice to admit attornies, according to their discretion, as had before been observed," and concluding with the remark that "although necessarily

subject to local customs 'of particular places and particular courts,' the bar of the United States, generally, is subject to the same principles and doctrines of common law applicable to their brethren in England."

From this exercise by the judges of certain of the English courts, under authority of parliament, of the power to admit attorneys, coupled with the unverified assumption that a similar power is exercised by the Supreme Court of New Jersey, a conclusion is reached which is thus stated in the brief of counsel:

"Our contention, therefore, is that it is the right of the legislature to regulate and control the admission of attorneys and counsellors-at-law in this state; that the legislature has the power to prescribe the requirements and qualifications incident to their admission; that the control thereof hitherto exercised by this court by virtue of the authority of ancient ordinances and statutes was always limited by this right of statutory regulation, restriction and alteration; and that the authority by which the power was originally conferred may regulate, control or divest it. Hence the act of April 7th, 1903, is not in derogation of any inherent, constitutional prerogative of this court, and should therefore stand."

The assumption of fact upon which the validity of this argument depends, which has been conservatively characterized as "unverified," is that the Supreme Court of New Jersey exercises the power of licensing attorneys or of admitting them to practice, and the conclusion of law based thereon is that as the right thus exercised is an inherited one, originally granted by parliament, it is still subject to legislative control. But it is not a fact that the Supreme Court of New Jersey licenses attorneys-at-law or admits them to practice, and if this function has ever been exercised by it, either in state or colony, I have been unable to discover the least trace of it, either as an inherited prerogative or as a statutory authorization. The nearest approach to it is a reference contained in a letter of one Ferd. John Paris, annexed to a report made by Fran: Fane to the lords' commissioners of trades and

plantations, on the 3d of December, 1734. *New Jersey Archives, vol.* 5, *p.* 377. It may be gathered from this letter that on August 16th, 1733, a bill or ordinance had been adopted by the colonial assembly of New Jersey touching the practice of law, which was, upon the strength of this letter, adversely reported and disallowed by King George on April 13th, 1735. *Allin. L., p.* 99. What the provisions of this ordinance were touching "Practisers of the Law," is left in obscurity by the letter in question. This is what it says:

"We skip now over the 12th to the 13th Clause, in ord$^r$ that we may consid$^r$ altogether the sev$^l$ parts w'ch relate to the Practisers of the Law, And this Enacts that no pson shall be at any time hereafter admitted to practise as an Atty but such as are Skilled in the Law [who's to try that, not their Judges in New Jersey, Sure] of good name & who have Served at least 7 y$^{rs}$ Apprenticeship to an Able licensed Atty, or has Studyed the Law 4 y$^{rs}$ at least after he came of full age—How their Judges may understand this word *admitted* I know not, whether they may not pretty fairly construe it *permitted.* And if so possibly the Scheme may be to throw out and exclude the whole p$^r$sent Sett of Practisers in Ord$^r$ to lett in a new Sett who must pay so many 20$^s$ to the Gov$^r$ for their licenses, and so many 20$^s$ to His Secy, and so many 10$^s$ to his Cheif Judge; If so His Ex$^{cy}$ may raise a pretty sum of money & may do (as has been done in other places) turn a bill, for the regulating the Practisers of the Law, into a money bill."

From the writer's parenthetical references to the judges, it is evident that the ground of his apprehension was surmise only; but, on the other hand, his reference to the governor's licenses indicates the existence of a practice already in recognized vogue. This colonial act was apparently a second attempt to provide a Practice act for New Jersey, a former act having been disallowed on November 25th, 1731. *New Jersey Archives, vol.* 14, *p.* 476.

In June, 1765, another act, entitled "An act regulating the practice of law and other purposes therein mentioned" (*New*

*Jersey Archives, vol.* 10, *p.* 199), was passed, which was likewise disallowed by the King in council on December 9th, 1770. *New Jersey Analytical Index, p.* 417. The provisions of this act are not known save that it contained a clause suspending its operation until the King's pleasure be known, and hence it never took effect.

As the result of such research as I have been able to give to the subject, the only conclusion I can reach is that the assumption of legislative authority upon which the petitioners' argument rests is not only unverifiable, but is inferentially, if not demonstrably, unreal.

The matter need not, however, be further pursued as it is enough for present purposes to say, what no one can contravert, that attorneys-at-law in New Jersey are not appointed, licensed or admitted to practice by the Supreme Court or by any branch of the judicial department of the state. They are invested with that privilege by letters-patent, issued under the great seal of the state by its chief executive, in language that is of itself a complete refutation of the assumption upon which the petitioners' argument is founded, viz.: "I (the executive), being well assured of the knowledge, learning and ability of ———, have thought fit to constitute and appoint, and by these presents do constitute and appoint him, the said ———, an attorney-at-law and solicitor in Chancery, hereby authorizing him to appear in all the courts of record within the said State of New Jersey and there to practice as an attorney and solicitor in Chancery according to the laws and customs of said state, for and during his good behavior in the said practice, hereby authorizing and empowering him, the said ———, to have and demand, take and receive such fees as are or may be by law established in the said state for any service or services which he shall or may do as attorney-at-law or solicitor in Chancery in the said state. And all judges, justices and others concerned are hereby required to admit him accordingly."

In this language three things should be noticed—*first,* it is that of a mandate addressed to the justices and not that

of an appointment made by them; *second,* the executive licensee is constituted a solicitor in Chancery, a privilege that the Supreme Court of this state is confessedly powerless to confer; and *third,* that the patent itself is based upon an assurance by the executive that the licensee is possessed of certain qualifications. This assurance, historically speaking, refers to a certification by the Supreme Court as to the qualifications of the licensee and its recommendation to the executive for his appointment, which recommendation is likewise, as a matter of history, based upon an examination made by the Supreme Court or under its supervision.

This executive act rests upon no statutory authority, express or implied, although in the instructions to Jeremiah Basse, governor of the province of East New Jersey, sent by the proprietors on April 14th, 1698, was one requiring him to consent to the passage of a law that no person should practice or plead for hire "but such as are admitted to practice by license of the governor of the province for the time being." *Leam. & Spi., p.* 223.

I can find, however, nothing to indicate that such a law was ever passed.

Similarly, the examination and recommendation by the Supreme Court upon which such action is based have no legislative antecedents, ancient or modern. The custom is *sui generis.* It originated as customs do, and has grown as customs grow, and is, both historically and constitutionally, susceptible of consideration quite apart from the question of the power of the legislature to provide some other mode of appointment, a question with which we are not now directly concerned.

The statute under consideration does not seek to withdraw the appointing power from the executive, or to do away with the recommendation by the judicial department as to the qualifications of appointees. Upon the contrary, it recognizes each of these subsisting institutions and limits its provisions entirely to denying the right of the court as such recommending body to examine those whom it shall recom-

mend. To this narrower question therefore our decision must be confined if we would avoid passing by way of *dictum* upon matters that are not before us. The decision that is thus called for seems to me to present no obscure questions. The words "certification" and "recommendation" used in the executive appointment so strongly connote the right to test by examination that which is certified, or him who is recommended, that, if not conclusive of such right, it at least prepares us to find that which historically appears, namely, that the recommendation of the Supreme Court to the executive has always included the right of that body to institute and conduct the examination upon which such recommendation was based; and also that, historically, this power has always been exercised by the Supreme Court under rules framed by itself, the earliest of which, in accessible form, were those adopted at the February Term, 1805. 4 *Coxe.*

From a small manuscript volume, in the possession of Garret D. W. Vroom, Esquire, on the title page of which, in the well-known handwriting of Garret D. Wall, is written "Rules and Orders of the Supreme Court, together with a list of the Attorneys, Counsellors and Serjeants of said court. G. D. Wall. Extracted by Garret Dorset Wall," I copy the following rules which are all that pertain to the matter in hand, believing them to be otherwise inaccessible :

"August Term, 1752.

"To prevent any application to this court for the future for certificates of recommendation to the govr. for licensing of attys by persons not duly qualified ordered that no person be recommended by the judges of this court to the governor for a license to practice as an atty in this province by virtue of any indenture of clerkship hereafter to be made unless they shall have faithfully served in G. Britain, Ireland or in this province or any of the neighboring colonies for the space of five years to some atty or attys at law and shall produce a certificate of such service and of their good reputation and behaviour. Provided nevertheless that if any

person of approved integrity and of sufficient ability as the same shall appear upon public examination in open court shall desire to be recommended the court in their discretion may grant such recommendation."

"April Term, 1767.

"Whereas, the mode and rule for the recomn of attys to practice in the several courts of this province has upon experience been found improper and inadequate for the valuable ends designed thereby. It is therefore ordered that for the future upon appn. of any person to be recmend as an atty at law of this province he shall produce a certificate from the gentlen whom he has served purporting that he has served him faithfully and constantly as a clk for the space of five years and that he is properly qualified both as to integrity and ability in his profession and that his ability and capacity be appd upon a public examination in open court without which no person shall be entitled to a recomn from the justices of this court to the govr for a license, and whereas the court also considering that the undistinguished admission to practice both as an atty and counsellor at law has been inconvenient and the introduction of a contrary practice may be of great utility and put the profession of the law in this province upon a more respectful footing. It is therefore ordered that for the future the recomn as an atty and counsellor be distinct and that no person be admitted as an atty and counsellor at law until he shall have practiced as an atty for the space of three years at least and upon such appn to submit to such an examination in open court touching his ability and knowledge in the law as the court shall think proper."

"September Term, 1780.

"Whereas it has become essentially necessary to the honor and dignity of this court as well as to the benefit and security of the suitors therein that some farther rule for the admission of attys should be established and inviolably adhered to— it is on full and mature consideration unanimously ordered

by the court that no person whatever be hereafter recommended or admitted as an atty at law in this state under the age of twenty-one years and unless he shall produce a certificate from some gentleman of the profession with whom he has served purporting that he has served him faithfully as a clerk for the space of five years and be approved of on an examination before one or more of the justices of this court at his or their chamber in the presence of such gentlemen of the bar as shall be appd. by the court for that purpose and any others who may think proper to attend. Provided that any person who shall have been admitted to the degree of bachelor of arts in any colledge or university and shall be approved on examn as above mentioned may be recommended and admitted as an atty on producing a certificate of having faithfully served a clerkship of four years only. And that every atty so admitted shall practice at least three years and pass an examn as afsd previous to his being recommended or admitted as a counsellor at law in this state. It is further ordered that no gentleman altho regularly admitted shall practice as an atty on record who doth not reside in this state. It is furthermore ordered that whenever an atty from another state shall make application for a recommendation and admission as afd he shall produce to the court proper testimonials of his service as a clk and length of practice amounting in the whole to at least five years and pass an examination as affd."

These excerpts trace the custom in question from a period long antedating the constitution of 1776 down to the adoption of the constitution of 1844, and show that during all this time it was a practice continuously and uniformly exercised by this court as one of its well-defined powers. Constitutionally speaking, a custom having this history and no other antecedents, exhibiting these qualities and this course of administration, constituted, at the time of the adoption of the constitution of 1844, a distinctive attribute of the Supreme Court, having no existence apart from it essential to the

government, and yet unclaimed and unchallenged by any other body within the state. It was therefore, both as an historical fact and as a legal conclusion, one of the powers of the Supreme Court as that tribunal then existed. A convention that included Henry W. Green, Richard S. Field, Peter D. Vroom, Joseph C. Hornblower, Martin Ryerson, Abraham Browning, Joseph F. Randolph, E. B. D. Ogden, O. S. Halsted and Mahlon Dickerson, will be assumed to have acted with knowledge of the power and practice of the Supreme Court. It was, in fine, one of those "powers" which, in addition to its "jurisdiction," that court was, by that instrument, authorized to continue unless other provision was made therefor by the constitution itself, which was not done.

The circumstance that what was thus continued was a *power* and not a jurisdiction is unimportant, in view of the language of the constitution itself, which, by naming both, implies that one does not include the other. "Shall continue with like powers and jurisdiction," are the words used. Likewise, the fact that the power so continued originated in custom and not by statute is without significance, since the constitution itself makes no such distinction; nor does the fact that the power in question is not specifically mentioned militate against its continuance. The power of Circuit Courts to decide for themselves and without review whether new trials should be granted is not specifically mentioned in the constitution, but such power is continued in such courts by force of the provision cited. *Tunison* v. *Central Railroad,* 26 *Vroom* 561. The right of the same courts to review by *certiorari* judgments in suits originated in justices' courts is another instance of the same sort. *Dufford* v. *Decue,* 2 *Id.* 302. And numerous other instances might be cited.

The test suggested by the case first above cited is "the existence of a well-defined power prior to the adoption of the constitutional law." Such well-defined power existed, as we have seen, in the Supreme Court to examine those whom it recommended for executive license, and this power, in its relation to such recommendation and mode of appointment,

is therefore, in my judgment, not subject to derogation at the legislative will.

From this it follows that the act of April 7th, 1903, whose sole object is such derogation, is ineffective and affords to the petitioners no foundation for the demand which they have based upon it.

In framing these views care has been taken to avoid any expression of opinion respecting matters which, though argued, are not within the purview of the statute of 1903, and hence not within the proper scope of the present decision.

The recommendation of the petitioners to the governor must be withheld.